Council, I have a cryptic note that your team wants to share time and didn't know who was going to do rebuttal. So, you've got 20 minutes. Okay. And you can do whatever you want with it, but that's your time. Thank you, Your Honor. Todd Burns, I'm V.F. Kabov, and our plan is to divide the time evenly, and then I was hoping to save two minutes of my time for rebuttal. Okay. So I'm hoping to sit down at eight minutes. I know. We'll try to panel your way. Okay. And then we're going to address separate issues, but the issues apply to both of the clauses. Okay. And all issues apply to both of those? Yes. Okay. That's good to know. Go right ahead. And I'm going to focus on some of the issues related to prosecutorial misconduct, and I want to begin with some of the issues related to Courtland Gettle, who is the prosecutor's cooperating witness. Mr. Gettle's testimony had a narrative arc, which in a nutshell was that in 2012, he had never been in trouble with the law. He had been sober for 18 years. His son died, and in his grief, he began using copious amounts of drugs, and that involved him buying massive amounts of opiates from the Kabovs, and $30,000 a month over the next two years. And as a result of that drug abuse, he lost his way and committed some real estate frauds to the tune of $50 million. So let's suppose, for purposes of my question, the quite plausible view that Gettle just lied his head off, and they were serious lies about how he was tipped over by his son's death. And I know the prosecutor says, oh, he didn't exactly say that, but I don't know, but I'd like that to mean, and the prosecution just hid this stuff from him, all the bad stuff about Gettle being a real estate crook and about his son not being dead at all, and they just hid it from him. Let's assume all that. In this case, there's so much physical evidence that I'm wondering if it matters. I mean, you should have been allowed, in my hypothetical, to use the evidence the prosecutor hid from you. This shows that nothing Gettle says should be believed. He's a liar. He's a porous character. Nevertheless, would it matter because of the physical evidence? Well, I think, yes, it would. And one of the specific points in his conduct with respect to Gettle I think is especially telling, which is that he said he purchased these massive amounts of opiates. And when he was confronted on cross with the fact that his credit card record showed $72,000 worth of purchases for steroids, he said, oh, I went over my other bank records, showed withdrawals of cash and wires to purchase the opiates, and I went over that with the FBI agents before trial. And there's no evidence of that provided, of course, and if that's the opposite, it doesn't exist. There wasn't a spreadsheet provided post-trial that shows this review and shows what Mr. Gettle told the agents. There's no opiates. There's no drugs sold to him by the cabal. Much more fertile ground for cross-examination, had you known that. So if a judge clamped up on the question, as I understand it, they'd love to assume that they found that the jury knew all of that, but the witness lied about lots and lots of stuff. And there's support to all of this. You know, if he wasn't a star witness, he's not capital. There's so much other evidence of guilt. So we'll take that. And I understand that. But I wanted to preface my response by saying it's not just a matter that the jury could say, this guy's just a big liar. How can we believe anything he said? It's that his core testimony about buying opiates from them was completely undercut. So it's not just that he's a liar. It's that he lied about the central point. Well, he was the only one who testified, the only alleged customer who testified. And that, I think, leads to the answer to this question, which is the government had a four-year investigation involved in this case, involving three different federal agencies. They were only able to produce one alleged customer. That's Cortland Gettle. They produced no video or agent testimony of surveillance of drug transactions. I mean, in my experience, I've been doing this for a little while. Federal investigations that are proactive, not reactive, have if someone is dealing drugs for a long period of time, have surveillance, have confidential information, have evidence, hard, direct evidence of these drug sales. Here, all they have is Cortland Gettle. And not only that, in their closing. Oh, no, they have a whole lot of evidence that Cabot has bought a lot of drugs and will sell a lot of drugs and deliver a lot of drugs. I should have spoken more carefully. Here, the only evidence of a customer who was buying drugs illicitly from them, the only direct evidence of that was Cortland Gettle's testimony. They don't need direct evidence. The standard jury instruction on circumstantial evidence tells the jury they don't need direct evidence. Well, that's true. But my point is I think a juror could reasonably question, well, what's going on here? These guys are selling these drugs illicitly. It's not whether a juror could reasonably question. It's whether the outcome would have been different or might have been different, depending on which testifies. Of course, the standard evidence, though, is that there's a reasonable likelihood that it could have effectively hurt it. Yeah, and that's what I want to know when the jury hears about how much drugs that Cabot's bought and how much they sold and how much they delivered and the shady ways in which they accomplished the deliveries. Why would it have made a difference whether they knew, as they should have known, actually that Gettle was not a witness to be trusted? I come back to the point where you're unsympathetic with the prosecution, frankly. I found your argument quite persuasive on that. Sure. But it's hard to see why it would have mattered. Well, I think if the prosecution had corrected the false testimony presented, which they were obligated to do, that would have been very much a black mark on the good faith of their case and on what was going on, and that would have caused doubt. And I think when you combine that with the fact that, well, if these gentlemen are engaged in illicitly selling drugs. Okay, so imagine yourself in the jury room, as I suppose that test that might have made a difference requires you to do, and one of the jurors says, this Gettle, the guy's a total liar. And the other jurors say, well, yeah, probably is. So what is going to be the next part of the jurors' discussion? And I think part of that discussion could obviously be, look, there may have been something untoward or illegal going on with the pharmacy. There may have been failure to follow the civil regulations, et cetera. But that could well have been undertaken by the pharmacist, who was not called as a witness, who would never be questioned, Michael Lowe. It could well involve Mr. Lowe and Dr. Altamirano, who was never presented as a witness. Can I stop you there for a second? What did the jury hear about the manner in which Dr. Altamirano prescribed Roby's prescriptions to folks that they didn't know him and hadn't seen him? What did the jury hear about that? Well, I think what they heard is that many of the prescriptions were written by Dr. Altamirano, and that they heard on occasion, that means that they heard evidence to suggest that the Kavats had a social relationship with Dr. Altamirano. Did they hear from some of the people who had been former classmates of the French who said they'd been victims of identity theft and they'd never met Dr. Altamirano? Yes, there were four such witnesses. And did they hear the nature of those prescriptions, the amounts, the quantities of substance that was prescribed? Yes, they did. Did they hear anything, any testimony describing him, and it might be an e-mail, describing Dr. Altamirano, that the brothers asked him to come to a bar or a restaurant and to bring his prescription tablets to write the prescriptions? I believe there was at least one text chain about meeting Dr. Altamirano at a bar. I appreciate your candor. I've gone all to the plant and everywhere. I know this is very, very important to the parties. But just following up on Judge Klein's question, it seemed to me that this evidence was really devastating, and I wanted to give her a chance to respond to it. Well, again, I think he comes back to that the judge could have well concluded that there was something illegal going on at the pharmacy without concluding that the Kavats were involved in selling a massive amount of opiates illegally. Okay, because of the theory that they had hired a pharmacist. I appreciate you sharing your theory on that. Thanks very much. I will tell you both that I am concerned about the jury instruction argument. I'm not sure where that's going to come in. I think that's the first thing that Mr. Wicks is going to discuss. Can I just put it real quickly on the go, and then I'll get a little testimony. Is it possible there was a transcription error? Because he does refer to his son later in his testimony. I don't think so. I don't think that the government thought there was a transcription error. If you recall, in the district court, their first excuse for why they didn't correct it is, oh, we just thought he was confused. Well, that's fairly generous to a $50 million fraudster. They've abandoned that excuse on appeal and said, oh, the jury could have figured it out themselves. Well, the defense counsel didn't figure it out, so I don't know how the jury was supposed to figure it out. I would say, as emphasized in the brief, there are a bunch of situations here where something was amiss with the prosecution, and they should have corrected things. And when you deliberately don't correct things, as the court said, reversal is virtually automatic. And I think it bears throwing in there that if you're willing to put your neck out there as a prosecutor and not correct these things, they must be important to you. Well, speaking of putting your neck out, let's be fair. Was there a strong argument that the prosecutor knew that that witness testified falsely? Which statement? Well, I think the sound thing is the most obvious, especially because they changed their excuse from district court. Now, I think the bank spreadsheet is an obvious one, too. Why? Because he said during his testimony, I've gone over these bank records with the FBI and shown them where the massive withdrawals are to buy these drugs. The defense counsel didn't have that. That should have been turned over to Rule 16. Is it Brady? Well, I don't think it's Brady because, yes, because they must have known when he was saying that, but that was not true. And I think probably what? That he hadn't gone over the spreadsheet. No, that his bank records don't show cash and wire withdrawals to buy these drugs. And I think you could say it was Brady, but I think logically what happened is they didn't anticipate he was going to lie in that way. They didn't anticipate he was going to say that, so they didn't turn over the spreadsheet. But once he went and lied, then post-trial they said, Well, this is Brady. It's really Naboo. Turn it over after trial. But what they should have done is corrected it at trial, and they didn't. And not only have they not corrected, they've leaned in and didn't get on their closing. I mean, you know, at a certain point it went too far. But as far as materiality, I think, you know, the district court never applied the right standard to any of these many instances. And I think given the complicated record, what would make the most sense probably practically is for the court to review those things and indicate what standard of materiality applies and then remand to the district court to apply that in the first instance. I don't think it can because it's important to your client. On my part, speaking for one, the Naboo and Brady claims are very hard, so I'm not concerned about an instruction. Okay. Well, then I will take that hint and sit down. I have an instruction. I still have a question for you. I'm a little confused because I think maybe I'm mixing up two instructions. One looked like in plain error because the judge gave the instruction that the defense needed. His voice is going to address the instructions. I could stumble through it, but it wouldn't be very ahead of time. Thank you. Good morning, Your Honors. My name is Ann Boyce, and I represent Delaware-Canada. My plan was to address the jury instructions and the remaining issues. Given the court's interest and the amount of time left, I will focus purely on the instructional issues. I'm certainly happy to answer other questions that the court has. I have two questions, basically. One is, I thought your argument was pretty good under Rule 1, that they had motor pets to extend all the way down the instruction. But I was worried because at least one of these instructions was submitted by the defense, so it's in plain error. Straighten me out. Educate me. Sure. So, from the beginning, the defense actually did dispute whether you should have this language in it about the usual course of professional practice and whether they should be instructed that the mabob should be treated as medical professionals when, in fact, they were not. I'd refer the court to E.R. 4558. Now we're talking about the distribution instruction. Yes. Okay. They're not responding to my question right now. I'm sorry. You should be on behalf of each other. I think the question went to the importation instruction. My apologies. It's not a rights issue. My apologies. So, the rights issue. No, I think the court actually, I think they did specifically say the dispute that's in the district court was over whether the lack of an appropriate license was something that CAVAS had to know. That was clearly an issue. So, assuming we had Rule 1, your team had the burden of production. So, it's always difficult when it's encrypted. It's always so bad about this. It did not have the benefit of Rule 1. Nobody did. So, here we are. And I think your argument is that you didn't get the instruction you're entitled to. You made that argument in the briefing, but you still have the burden of production. Right? So, could you speak to what evidence in that record would have entitled your client to this instruction? Sure. I think there are two things. First, it's the fact that they were a licensed pharmacy. And second was the fact that when you look at the communications about the importation, nothing suggests that they understood that they needed a license. So, when it goes to the question of what they had to know and what they were required to do. I think the license pharmacist is relevant to whether or not they were licensed to import. But the question is whether they knew that and whether they did. Or is it Rule 1 is saying you have to have the burden of production that you were authorized to import. So, I think it's the burden of production. Rule 1 has, I think, two elements. One is the burden of production as to whether you were authorized or not. And then second is the question of mens rea. Did you know that? Right. I think, as I read Rule 1, you have to satisfy the first part, or introduction of authorization. Then you get the second part, which is the mens rea. You read it differently. I do. I read it as a requirement for both. And so, the question of whether it was authorized. And there's no detribution. I think that they did not actually have a separate authorization. And, of course, it's easy to know that. And on that point, it's just all a difficult motivation. I don't think there's any evidence otherwise. Right? I didn't know that they actually had a permit to import. They weren't licensed pharmacies. If you have evidence in the record, I think there is evidence in the record on the e-mail chain, and certainly it was argued in posting, that they didn't act like that. The e-mail chain showed that they didn't act like he knew otherwise. And this is the e-mail. We all know what that is. Make sure you put everything down. In California, I use the correct name, use the correct address. So, that's part of it. He didn't act like he thought it was the problem. Correct. But is that enough? I think so. The burden of production is a relatively light one. And it shifts immediately. So, the government has to show beyond a reasonable doubt that they have shifted. But before you shift the burden under Rowan to the government, you have to meet the burden of production. I just want to parse the question, Judd, from McKay's asking. But I share it with him. Is it enough that there's evidence in the record to show that your client thought they had the license to import? Or would there need to be evidence in the record to show that the license covers that action? So, the answer to the first question and no to the second. They needed only to know. So, the question was, did they? Okay. So, will you answer it correctly? I'm not sure I even figured it out. Your position is, yes, on that question. Wouldn't they also have evidence in the record to show one of the exceptions, that is, that the importation was for a legitimate practice, a medical practice plan? So, I think if they had shown that they had a permit to import it, then, yes, it would have been adequate. There's also testimony from a doctor who testified during the defense case. That it was difficult at times to obtain the medication. Okay, wait a minute. Are you talking about Dr. Lee, the person who prescribed steroids for HIV patients? Yes. Okay. So, we're getting back, talking back to each other again. If you could go back to the decision tree, how would you ask him whether or not he would need evidence in the record to show that the importation was for a legitimate medical practice? It doesn't have to be a medical practice or other legitimate practice. And I think there would be some evidence in the record. All I can see is Dr. Lee, who testified that he imported through them, ordered through them, all three kinds of steroids, that makes that count, six, seven, and eight. And then he initially chose directly to the patient-taken drugs. So, I'll grant you all of that. I've gone over the record carefully. But can you go back to the decision tree, since it's a luxury? There's one lining up there. Can I ask you, if you don't get to this evidence, do you need an exception unless there's evidence of the license? Is that what you're saying? No, I'm sorry. Okay. No, let me clarify. So, I think that there are two sort of separate problems. And where we are, there is one, did this meet some of the other criteria? Of the exception, of the statutory exception for importation? The exception, when we're talking about the exception, we're really talking about the knowledge of the exception here. And so, the question is, have we shown enough, between the testimony of Dr. Lee, between the e-mail that you referenced, where Mr. Carlisle showed, you know, adding the material and everything else, and you decided yourself to this instruction, you wanted an instruction, you wanted, was that your folks, your clients, weren't guilty because they reasonably believed that they had, or the government hadn't shown that they couldn't import the device? Because the government had not met their burden of proof. Right. To show that they knew that they were not authorized to import these drugs. Okay. And that is an element exempted on the permanent project. This instruction that you are contending was mistaken. This was not an instruction that was provided to the court and requested by the defense. No, they did actually ask for an instruction. When you say they, I don't know what you mean. I'm sorry, the defense counsel did at the 20ER-4563-368. Who are you? Where are you? I'm sorry, Drew. 20, it's volume 20 of the ER. I'm sorry. It's 4563-368. But what if the instruction was proffered and rejected, was not directed either? Did that matter? It doesn't, because I think it still puts the issue into play, which is what do you have to show about the defendant? I answer, everyone, not just the court, would such things not benefit everyone? Okay. Right. And I think your client, you didn't waive it. Your folks were trying to run this defense, which was if the behavior grew on in registered analysis, no, they grew on the defense. And your status argument that it's just a sort of statutory language alone that the behavior grew on in reading is that the government had to prove its intent. And I think you've run through all the evidence that you think would have entitled them that wouldn't satisfy their production. Yes, I think that coupled with the fact that they were licensed pharmacies, because they were entitled by court of evidence. Did the jury hear about that, about the pharmacies license? So they did hear about it in part through the government, because they were not allegedly not complying with regulations. And then the subject name, is that what I would find in the subject name? I think Deborah Wyatt as well. Deborah Wyatt. So Deborah Wyatt was the inspector who actually carried out the inspection and was then an expert witness who talked about the regulations that apply to licensed pharmacies. All right. In the supplemental briefing that you filed, you are using other instructions, which is, I think, what went there at the time, 10 minutes ago. That was post-Ruon. You didn't argue the importation instruction. You argued the distribution instruction. I think that Ruon applied to both. I mean, I think Ruon sort of amplified the right argument, at least in our principal briefing, which is that there is an element of spina bifida that applies here, and that element applies to all of it, including the absence of authorization to import. Which I made from the fact that the importation instruction is not included in your supplemental briefing. I don't think it is, anyway. It's not what you're given. In fact, you should. So I think the court should apply the law that it controls, which is Ruon and Rafe, and say you keep together. But even if this court were not to apply Ruon to the importation, I think Rafe alone means that there is error here by the failure to apply the requisite amendments, right? It's standard, to the element here of the lack of authorization, the lack of an import. You are saying essentially that the government didn't need a burden of proof when they're asking us to make any of these convictions for accounts 5678, I think. Yes, that is correct. We don't necessarily have the burden of proof if you have to make a burden of production to do that. I do, but I think the burden of production is not a heavy one. I think we've certainly put in enough evidence from first the e-mails, the exchanges about the importation, which have no intention to hide, no intention, you know, to use a false name, no use of a report that's not a briefing. I didn't see that in your briefing. To us, at least. That was included in, I'm sorry. I didn't see it in the re-age section, so I don't know if it's somewhere else. I'm not going to get into this, Mr. President, because I think you're at one page length. We have trouble, too, because the briefs and the excerpts are so excessively long. You really can't find anything. You can't figure out anything. It's really hard. Help me with something on Mulan before you sit down. What the Supreme Court did was reject a whole bunch of government arguments that would basically make a doctor who prescribed too much dope guilty of a running a pill mill under the guise of being a doctor. And they rejected all the government stuff about how the doctor has to show what was reasonable or the jury has to be instructed that the doctor has to be shown to have been unreasonable or not to have met the objective standard of this profession. For some reason, I forget if I ever knew exactly what burden of production the doctor met and how he met it in Rwanda. Was there anything other than I'm a doctor. I prescribe narcotics for pain. That's what doctors do. Was there anything else at the time that produced in Rwanda? So the question I think we meant to the appellate court to make that determination. So what the Supreme Court did was articulate the framework and explain that there was this burden of production. And then the burden shifted to the government to show it beyond a reasonable doubt. Here, if the court has a question. What the burden of production is. The rule of law says there is such a burden, but I don't understand what it is. They draw some analogies to other cases that suggest it's not much of a burden. But do we have some kind of test that we can say, well, the Supreme Court told us this is the burden of production, and we can't walk straight through this burden? I think the cases that the Supreme Court cited, too, I think the court can look to other analogies for what the burden of production normally is for defendants in criminal cases, and it's generally a light one to avoid shifting the burden of presumption or shifting the burden of proof. In effect, that's a good question. I can offer to submit a 28-day letter to my patient. As far as my review of the briefing, you did argue the licensed pharmacy. But I don't think I saw anything about the implications of the border. So if you could point me to where that is, that would be great. Assuming that you did not argue that, and you only had it at the licensed pharmacy, is that enough to meet your burden of production? Yes. And why? Because, again, it goes to whether you believe that you have authorization. If you are a licensed pharmacy, you know that you can order drugs. Do you understand the distinction between being able to order drugs from a U.S. wholesaler versus one that's abroad? And that is the classic sort of regulatory distinction. I think the draw of the distinction between what's innocent conduct on one hand and culpable conduct on the other. A lot of drugs still come from abroad. So a little pharmacy in Fairbanks, Alaska, is ordering drugs that I guess a lot come from Switzerland. A lot of the generics come from Israel. Are they importers, or do they just deal with some American distributor down the chain? We have that layout with U.S. wholesalers in addition to the ones that were imported. And so there's nothing in the record that suggests that they understood that there was a legal distinction between what they could order in the U.S. and what they would need to be able to order from abroad. They had some kind of import permit or papers, didn't they? They believed that they were acting in good faith consistent with the regulations. Neither of them were pharmacists. That wasn't exactly my question. My question was, did the pharmacy have some kind of importing papers? No, they wouldn't have authorized these. It's substance abduction. Sorry, if I could go back to that, the communications. Your argument is that the Chinese importers said just put everything down. We're a pharmacist. Is that the communication you're talking about, that email chain? Yes. So how does that show that they thought that they had an importation license? It's just that they weren't aware that they were doing anything wrong. They didn't ask them to find what the substances were. They didn't ask them to send them to a fake name or to a different. They ordered them the way that you would any other order that you were placing in the normal course of business. It doesn't show any kind of consciousness of guilt. It means that that is more than enough to meet what is generally a light burden of production because, ultimately, this is an element on which the government bears a burden of proof. And to the extent that the court has questions about it, I would submit that one thing this court can do, given that the record is incredibly large and complicated, is simply bring them to the district court to apply broader case and make a determination about whether or not this went as far as it's going to go. This court, Benjamin Bearer of the United States. I want to begin just by touching on the three standards that apply for the false testimony of new evidence claims. That's fine. Let me just make one point then. I wrote two points. The first is, if the district court claims the district court found, whatever you make of the false evidence claims, that the government didn't know that the testimony was false, that finding is previewed for clear error. I didn't know that the government didn't know that the son was alive. And the guy testified in a way that I think any ordinary person would understand to me. His son died, and between his son and his pharmacy, I tipped him over. He fell off the wagon. I mean, you can make an argument, well, he didn't really say that. He didn't exactly mean that. It's kind of ambiguous. I don't know. I read it as just covering up a lie. Let me make two points to that, Your Honor. I was shocked by it, frankly. Yes, Your Honor. The two points are, first of all, the government told the district court that while she represented that his son suffered from cystic fibrosis, we didn't know for a fact whether the son was dead or not. But the second point is more important, which is, if you look at the cross-examination at 3105, the defense attorney asked a series of questions, the premise on the son being alive and a list of testimony about the son being alive. And that's important because, first of all, none of the parties understood at the time of trial. I thought the judge told the governments who investigated that his son was alive, and then he told the jury his son was dead. No, Your Honor. What we told the district court was that he talked about his son having suffered from cystic fibrosis, but we didn't know one way or the other whether the son was dead. So you were just giving them the benefit of the doubt instead of giving the benefit of the doubt to whether he needed to tell the defendants what was going on here. No, Your Honor. The point I'm making is that the government didn't even understand at the time of trial for him to be saying that his son was dead. I don't know if he misspoke or not, but the cross-examination about therapy misspoke if he lied, if he told something untrue, or even if it wasn't exactly a lie, it was just a false statement. You had to tell. And, gosh, I don't understand why he didn't just give the defense the file. I mean, this guy was a crook. So the cross-examination at 3105 reflects his extensive testimony about his son being alive at the time of trial. If the defense believed that was false, the other testimony, you could have crossed the witness on that. But even so, Your Honor, we're dancing around. I have a case called where we specifically say that the ability of the defense to cross-examine and perhaps expose the false statement is not enough to avoid an APU error. The government has to stand up and tell the jury. I think this is the government's great credibility when they present the witness. Here's my point. It just looked really dishonest to me, and it tilted my view of your whole case. One of the points that I made is if the witness was in fact trying to deceive the jury about his son, he would have persisted in that lie later. I'm not talking about the witness. I'm talking about the prosecutor, the lawyer, or the government as well. I don't understand, Your Honor. I'm sorry. You have to make sure that the defense counsel has the information that you have that would impugn the credibility or prove or tend to be exculpatory regarding your witness. If you have a witness and you know that this guy is not to be trusted in many ways, you should give that information to the defense, and you shouldn't just let them lie to the jury and then see if the defense can persuade the jury that he's a liar. Your Honor, the district courts found that virtually all the defendants for AP claims would produce the evidence at issue. The district also found that the government didn't know this witness lied. In addition to that, I submit that whatever that statement said, neither of the parties understood it at the time of trial to be false. The witness, to whatever extent, as I recall, they didn't know at the time of the trial that the son was alive. And the statement sounded like it was that the government's investigator, before the testimony of the lying witness, didn't know that the son was alive. Your Honor, I understand why on a cold record it would appear to you that the witness lied. I submit to you that the record reflects that none of the people in the court believe the witness lied, that the witness gave correct testimony, correcting any misimpression, and that Renzi's dad is an innocent, graphically innocent person. So the defense said, gee, I understood you to say your son was dead. Is the son alive or dead? And the witness said, well, he's alive. I don't remember that occurring during the trial. Your Honor, look at Exhibit X of Article 3105. The defense counsel asked an extensive line of questions about the son being alive. It elicits the fact that he had spoken with his son right before trial. It elicits the fact that one of the reasons he wanted to testify was to be with his son. It elicits the fact that he feels comfortable that his son will be taken care of by his ex-wife after trial. Not one line of testimony read in the cold record has to be read in the context of the entire examination. Your Honor, you're saying it's very new by the end of the examination that the son was, in fact, not dead. Correct. And the parties believed that the witness had testified falsely. And Renzi said even if there was some possibility of a transcription error here. I think, to be honest with you, there either was a transcription error or he spoke. I don't know. But my point is it doesn't matter because whatever error there was was later clarified. And Renzi even makes it clear, even if he did misspeak, an error, an honest error, doesn't rise levels and improve violation. And he clearly didn't intend to misspeak the jury because why would he have answered those other questions the way he did? So I'll get to the instructions. Let me outline, to start with, how the Controlled Substance Act is structured. The Controlled Substance Act provides that it's unlawful to knowingly distribute a controlled substance, and then it creates an exemption, except it otherwise authorized. And there are several exemptions that exist in the statute. The one relevant here is the federal registration. And this exemption, this is designed for doctors and pharmacists because they distribute controlled substances every day. That's correct, Your Honor, yes. And so what Rewine did was essentially resolve a circuit split about what the government has to show in the distribution case involving prescriptions. The Ninth Circuit and Feingold and other circuits recognize a subjective standard, knowingly and intentionally acting outside the course of practice. I believe it was the Fifth Circuit in that case, but whatever other circuit was in Rewine, applied an objective standard. And what the Supreme Court did is effectively resolve that circuit split in the Ninth Circuit's favor by recognizing that where a defendant is, in fact, registered, the government bears the burden of showing knowingly and intentionally acting outside the practice. So Rewine really didn't change anything in terms of this circuit. Rewine doesn't say that the government has to prove it's outside the standards of practice. It says the government has to prove beyond a reasonable doubt that the defendant knowingly and intentionally acted in an unauthorized manner. It's not just proving that he acted in an unauthorized manner. It's proving that he knowingly and intentionally did so. So what this actually does, what you said about Rewine, that's not quite right. I mean, this is the words of Rewine. Well, what you look to is the regulation defining what is authorized or not. I believe it's 1306.04. And that provides that a prescription is valid if it's issued in a court. You're not hearing me. Oh, I'm sorry. No. What the Supreme Court says is that that is false and that what the government must prove is not that it is, in fact, unauthorized. No one has to prove that. In addition, it also has to prove that the defendant knowingly or intentionally acted in an unauthorized manner. That's a mental element rather than a measure against the statute or regulation or standard practice for what's authorized. What I would say, Governor, is do you understand the distinction between proving that it's authorized and proving that the defendant knew or, of course, is it being unauthorized? Yes, Your Honor. Of course. And I can look to page 2382 of Rewine, where it recognizes that in carrying that burden, I'm looking at the U.S. Reports, the official version. I see. What's the page number there? Your Honor, I would have to go there. Never mind. Never mind. You know, what the Supreme Court said is, I'll just read it. The government, of course, can prove knowledge of lack of authorization to circumstantial evidence, including, and I'll paraphrase now, by reference to objective criteria such as a legitimate medical purpose and the usual course of professional practice. And then the Supreme Court goes on to say, as we have said before, the more reasonable defendant's assertive beliefs and misunderstandings are, especially measured against objective criteria, the more likely the jury will find that the government has carried its burden of proving knowledge. So what the Supreme Court recognized in Rewine, much like what the Ninth Circuit, this Court recognized in Feingold, is that there's two showings. They didn't take away the mental element of that language. I did read that language. They didn't take away the mental element. They just said you can prove it by circumstantial evidence because this dispensation of controlled substances was so unusual and so far from what's authorized that you, the jurors, ought to believe, beyond a reasonable doubt, that he knew very well. The point I'm making, for example, if you gave somebody who came in and he had a prescription for a dentist after he got a wisdom tooth extracted, instead of for two or three days of narcotics, for two or three months of narcotics, that would be kind of out there. It's circumstantial evidence that the pharmacist should know there's something wrong with those prescriptions. Yes, Your Honor. And the point I'm making is what the statute and the Supreme Court regulation provide is that what is unauthorized in this context of a prescription and he had a prescription that is filled outside the usual course of practice. And it's filled with the wrong mental element. I mean, in the wisdom tooth case, they typically give you Tylenol for two or three days. And if you have a prescription for two or three years' worth of Tylenol and you gave it to you, being the pharmacist, to the purported patient, it's not that you're giving him Tylenol that goes beyond the normal practice of two or three days. The problem is you should know that this is not a bona fide, legitimate prescription because you know that they don't have to go for two or three days. So I agree within the context of what the statute requires. There's a hybrid showing. So first we have to show that the conduct was, in fact, unauthorized. That's the objective element with respect, and that looks to that term, the usual course of practice, which is objective. And then the second showing is, did the defendant knowingly and intentionally act without authorization? So did the defendant know, for example, here, that these prescriptions does make sense outside the course of practice? So you know it was unauthorized. Correct. And respectfully, the defendants were creating bogus prescriptions here. That was the case here. Okay. But did the instruction require the jury to find that beyond a reasonable doubt the defendants knew that filling these prescriptions was unauthorized? Yes. The instruction required the jury to find that the defendants knowingly and intentionally acted outside the course of professional practice, which by definition by necessity means that they knowingly and intentionally acted without authorization, because that is what authorization is, the commencing within the usual course of practice. I do want to note, sorry, did the government concede that RUAN applies to 852, the 852 charge? Yeah. They are different, and they're different, actually they have different requirements. Well, the reason RUAN applies in that context is because it addressed the implication of Section 885 of the statute, which is what provides that the government isn't required to negate an exemption until the defendant can get it. Yes. Okay. It addressed that statute. Basically, what the statute is, this is an importation charge. You have to have an actual license to import. That seems like a very binary objective thing, and versus the 841 where you have to prescribe it in the course of business or whatever the actual word. So that seems much more subjective, whether or not you know you're doing something within the profession, but whether or not you have a license to import seems very binary, very stark. So why would the RUAN rationale apply to that case? Your Honor, in both contexts, you have to have a license. So in the context of pharmacy, you can only dispense a controlled drug pursuant to a federal registration number under Section 822. That is what creates the exemption that the government then has to disprove. And then in order to import a drug, similarly, the pharmacy has to have that same type of authorization specific to import and control drugs. And what RUAN holds is that unless the defendant is promised evidence of an exemption, if this registration exists, the government isn't required to disprove and, in fact, approve non-exempt status. RUAN said that. I just recall it saying burden of going forward with something and not defining the burden. Your Honor, what RUAN recognizes is. It's just that I have this point. Because Judge Blumenthal is trying to call your attention to the evidence about the existence of the license, and then RUAN, that we're physicians, right? We're defendants. And here we have two people who don't pretend to be pharmacists. When you say hired pharmacists, that's an important point. And all three of us have tried to get you to focus on that. But just to understand where we're coming from, I think there's a difference there. Well, I think everybody appreciates the argument about RUAN. And I think for the government argument, I hear the word willfulness and the injunction was surplusage. So, you know, these big instruction arguments have our full attention. I see. Okay. So understanding that, you know, you're not charged with 20-20 hindsight, and certainly at the district court, is now we all have the benefit of RUAN. So that's why we're trying to get you to recognize, and certainly district law enforcement training mightily, maybe you need to focus on that. I'm sorry. It's a lot. But I'll tell all three of us, yeah. But that's quite a lot of difference, right? And those two defendants were submissioned, but I think that was uncontested. They were licensed physicians. The question was, did they know that they were prescribing in a way the judge might not have been speaking about? It's because we don't have license pharmacists. We have a pharmacy that was licensed. And so that's why I was torturing public counsel to get, you know, what evidence did the jury have about what that license was. And there is, you know, there was, I should say, we're coming from a fleet, right, and the record available to us not having been in the trial court, it's clear that the jury understood that the pharmacy had a type of a license. And there's this e-mail exchange that we've talked about where it indicates that Dalvor certainly didn't indicate he didn't act like the guy who got his license, didn't allow him to report, right? But is it your position, and you just answered, yes, the gentleman's question about whether Rouen applies to both importation and distribution, so this is important. Is it your position that the evidence in the record shifted the burden to the government? That is, did the defendants have to have evidence in the record of a license that allowed the pharmacy to import in addition to the e-mail exchange that I'll just tell you, that the defendant, at least one of them, thought that license allowed him to import? Your Honor, the answer is no at importation. The reason is because the burden never shifted as to the importation. Does that mean you think they had the burden to produce evidence that their license did allow it to import as well as that they thought it did? Yes, Your Honor. Not even that they thought it did. Rouen recognized the crucial role that authorization plays. I'm trying to understand your answer in terms of innocent drugs. Suppose a pharmacy uses a pharmacy tech who is really just somebody who fills orders or dispenses prescriptions over the counter or counts bills and has labels. That's what the pharmacy tech is doing. It's a big enough pharmacy so they have a tech who does the ordering, and that tech has been ordering some really common and standard. Coumadin, a blood thinner, perfectly, it's not a controlled substance, has been ordering Coumadin from a distributor in Michigan and discovers he can get Coumadin a whole lot cheaper from, I can't remember, that may be a Teva product, but maybe the Teva in Israel distributes the generic Coumadin, or maybe an output in India, I can't remember which. But the tech discovers they can get it a lot cheaper from the distributor in India or Israel, and so the tech puts in that order. How does anyone know that it's unauthorized and that they need a special paper from the government to order the Teva Coumadin, or even know that it is authorized, or even know that there's any authorization issue? How do they know that? I'm not sure what the law provides in the context of your hypothetical. Well, I think a prosecutor can look it over later and look at the rig and say it was authorized or it was not authorized. But since Rouhan says there has to be mens rea when they place the order and it's not enough to show that it was unauthorized, I'm wondering where you would get the mens rea from. I think the sticky point here is that the presumption or line of questions is that it's merely by virtue of the fact that there's a physician or a pharmacist that makes the conduct authorized or not, and that's not what the statute provides. The statute provides that what makes a physician's handling of controlled substances authorized is the federal license. You have a federal license or you don't. So if a physician were to write a prescription without a federal DDA registration number, that conduct would be unauthorized and, in this case, would be irrelevant. So in the consumer matters and the importation cases, it was undisputed that the defense didn't have the registration, they didn't have the license that would make their conduct authorized. And so by virtue of that, there was not. When you say it's undisputed, that's what I'm trying to get you to be more specific on this and that they would have had the burden to produce something otherwise than they did in the competition. Yes, they did. Or the unions or government affirmatively produced evidence. What did the jury hear? Nothing. So my point is not only did they never produce evidence that they had that registration, but the government introduced undisputed testimony for Spencer Shelton that they did have a registration. And it is because of that that their conduct was unauthorized and the burden never shifted back to the government. And that is why the importation counts shouldn't be reversed, even if the court order would be limited to those counts. And I'm not sure what the standard is, color or exactly what it is. Something can show that they didn't know that it was unauthorized, and then the government has to prove, yes, they did. It's not that it keeps shifting back to the objective part. It is, in fact, unauthorized. And we keep asking you about the scienter aspect. The point I'm making is that the government doesn't need to make an enhanced unless it's objectively true, or at least it's evidence of that, that their conduct was exempt by virtue of having a registration. Well, they have to prove that it was unauthorized in order to shift the burden of proof to the government to prove that they knew it was unauthorized. No, that's what the statute requires. No, it doesn't. I have a question. So I'm wondering about the sequence in which the defense did proffer an instruction. The government had the pages, but I don't want to take a lot of your time. I'm sure you're aware, argued that the willfulness was actually surplusage, and they did not need to make this showing. We all know now that was a wrong guess. That's almost incorrect. So I'm interested in a sequence about when the instructions, rulings, came down. And I have that conference here. I've got the on-record discussion about the jury instructions, and I have the argument that the defense counsel made in closing, which, of course, was evidence. We reviewed the evidence that was in the record. Was there anything pre-trial that would have, and this is all different defense counsel as well, but was there anything pre-trial where there's been support, any kind of call on what was or was not going to be required for the government to prove on this point? In other words, are they going to be in a position to say the reason we didn't introduce the evidence was because we didn't know that was going to be in the record? No, Your Honor. The government's consistent point to the court was the defense had a burden of production, and for that reason the government had to argue that it was surplusage. I mean, not that. At the end of the trial, they're arguing not. The willfulness language in the drug statute doesn't import cheap willfulness standing alone. What creates the enhanced science or burden is the defendants making a burden of production that their conduct was exempt. So I don't think our position about that blank term willfulness was incorrect. But if you have a burden of production for exactly what the burden is. Your Honor, Section 885, which provides that the government isn't required to establish non-exemption until the defendant produces evidence of exemption, Section 822, Section, if I'm remembering right, 952 provides, or maybe 957, in the context of distribution and importation, provides that you have to have a registration to have your product be authorized, and the defendants didn't have a registration added to the importation counts. I don't think it's more than that. The instruction the jury actually got strikes me as strict liability. It is not strict liability. I'm sorry, go ahead. It was that the defendants not only brought or caused a crime to the United States, but had a controlled substance. And the prosecutor argued to the jury this was a no-brainer. And the prosecutor argued to the jury this was a no-brainer on these importation counts because of that e-mail stream, because Alabama knew very well who was bringing the controlled substance into the country. So I'm concerned about that. Again, I'm not trying to copy the versions. I get that this is 20-20 hindsight. But I am concerned about whether the jury was misled, in hindsight, about the required requisite room approval. I think either did not need to find and have the clothing count put up. Same question. So would you like an opportunity to respond? Yes, this court in Jefferson recognized that the mens rea element is knowing importation of a controlled drug, and that was what did it say. Really, I'm asking you, should I be concerned that the jury got a very wrong message from the government's instruction and argued that the instruction required data and the government's argument? No, because the court correctly instructed the jury on the elements, which is what we had to prove as knowing importation. If the defendants wanted to argue, they actually could say it in the context of the sentencing argument, I suppose. But because they didn't meet that burden of production, it didn't shift what the court had to instruct the jury on. I know I'm over time. I want to make just two points. I've got time at the end. Okay. I've got a couple questions. So I know you've been at this over and over, but just to be clear, what is your belief that RUAN requires if they produce evidence that they have authorization to import? I'm talking about inline importation. Or is it they have to just produce evidence that they believe they have authorization to import? They have to prove evidence of authorization in the form of a federal controlled drug registration, or as opposed to maybe there's another exemption, like medical research, how that applies. So under that theory, then they didn't meet that burden, and so nobody shifted to the government. Correct. Okay, so assuming that that's wrong, and it's about that they have to prove just a mens rea, that they thought they had authorization, assuming that's the law, and that's what RUAN says for importation, they've offered two pieces of evidence that shows that the burden has shifted. One is the licensed pharmacy and two is communications with the importer, the Chinese importer. Do you agree that that meets the burden for shifting? Your Honor, yes, it does. The burden of conducting to then shift it to the government. Your Honor, understanding that I disagreed with the privacy, I have another question. If the court were to find that the court is not going to be disclosed required to provide the additional elements instruction, then the court should reverse add to those counts only. Okay, so you think that that meets the burden of production? I don't. I think that because the defendant's never recognized the crucial role that authorization plays. And because it's just knowledge, the belief that they have authorization, is the fact that they have a license for a pharmacy and their communications with the Chinese importer, does that meet the burden of production? No, because it's not enough to show mere belief. You have to actually show I've got the license, here it is. I'm saying that that's not the one. The question is whether RUAN requires objective authorization or just that they have objective belief, evidence that they believe they have authorization. Assuming it's that latter, are those two pieces of evidence enough to shift? No, because the defendant's objective belief isn't enough. They either were authorized or not. You just said twice that the defendants have to prove that they have authorization before the burden shifts to the government to prove that they didn't know that they were acting in an unauthorized manner. It's illogical. What I mean by that is simply that they have to share the burden of production. If you're saying the burden of production is they have to prove they were authorized, but RUAN says, no, they don't have to prove anything except to put reasonably at issue whether they thought they were authorized. Do you keep trying to shift this to something that's objective and to ignore in any practical circumstances the RUAN holding on SIENTA? My point is that you have to make a burden. You have to produce evidence that you were, in fact, authorized. Whatever your intent or if they say they're not, you either got the license or you don't, they did it presently to RUAN. Well, what RUAN recognizes is once that production is satisfied, which again is inversely. Once you prove you were authorized, then the government has to prove. That's the answer. But once you're authorized, there's no case. You never get the SIENTA. Well, I disagree because the TAG regulation provides an exception to the exception, which is in the context of distribution, not importation, acting outside the usual course of practice. So once you have the registration, now I have to prove that you acted outside the course of practice and knowingly and intentionally did so. So the burden shifts to me to make that showing. That's what RUAN was getting at. And that's what I said at the TAG meeting. I raised RUAN doesn't apply to the importation statute, I think. Well, the point I made is RUAN applies only as much as it applied to 885, which it also applies in the context of importation. I'm not suggesting that RUAN actually addressed importation. There isn't even a usual course of practice standard for importation. I think it may have been spoken of earlier. I heard you say it's an exception. I promise it's an exception for me. I can't find my colleagues. But it would be helpful when I ask them about why I think the importation instruction is not included in the supplemental brief, and she said because we were limited to five pages. Is that correct? I've forgotten it.  My colleague is never going to be kicking me under the bus. Your Honor, respectfully, I told defense counsel before those researchers admitted that I was planning on addressing importation. If Your Honor's wish. No, I'm just asking a question. Do we need supplemental briefing on this question? It sounds like it would help to clarify what's required here, so I would like to do so. Maybe put somehow a five-page limit. Boy, that's a lot of work for you. Yes, Your Honor. Okay. All right, that may be part of the problem. Again, now that we see how this has shifted out, that may be something we're going to want to discuss. Would you like to wrap up? Because you've been massively over your time. I know. For the submission instructions, the first is, if you look at excerpts 45, 43, 45, 44, that's the defense motion to exclude Dr. Gaines' testimony, where they explicitly tie that argument to the instruction, which goes to why the whole thing is waived anyway. And the second point is, counts two and three are distribution counts involving sales to the Ohio customer before they have the registration. There was no hands-on with that, so whatever Your Honor is thinking has no impact on those counts. And, again, I apologize if I misunderstood your question. I was doing my best. Okay. Thank you for your time. Okay. Not really. How are you doing? Who's going to? Wait, wait. I'm going to give you two minutes additional. I'm not going to give you more than two minutes. So that's not fair. If one or the other of you is going to do very well. Do you want to confer first? No, I think I can tell where the question is. We follow our rules. We're big on rules. So. Sure. Thank you, Your Honor. You'll have the time you need. Thank you. First, I just want to make a point. I'll do it very briefly. You said that it wasn't clear from the record that there was only one son. And I think a reasonable reading of what might have been over this early. And I will move on. And I will also say that we're certainly happy to provide supplemental briefing on. Was it a five-page limit? It was. Okay. The government's brief was over that hard. I don't know if my colleagues will put that in there. I just wanted to. I'm certainly happy to. I think we recognize these issues are complicated and that everyone, including me, that took part here was functioning without the benefit of Rwanda at the time. We know that. I'm sorry. I think in response to one of Judge Wilmot's questions, the opposing counsel said, if there's quite a hypothetical, then you should reverse and vacate these convictions. And we're talking about 5678, I believe. I think she was talking about 5678. But I think earlier, as you said, we have this problem. I think the corruption was affirmed. We should remand the district court to make a harmless decision. What's your position? So our position is that the court shouldn't reverse and vacate. How do you get lost in this? I think as an alternative, if the court doesn't want to itself undertake a harmless error analysis, which we recognize is complicated and difficult, it could send it back to the district court to make factual findings on that point. But you believe that that harmless enough finding would need to be made? Yes. Okay. Either by this court or by the district court. It's a structural error on the instructions. I thought instructions are structural. It doesn't matter. So if there is an element that's submitted, then the court reviews it. It's a harmless beyond a reasonable doubt standard, which applies in this case. So it's not categorical or structural error, but it's a very difficult standard for the government to make error on. With respect to the government's comments about this being a subjective standard, that is a new position. That was not what the jury was told. And that's part of the real problem here, with both the distribution counts and the importation counts. Because with respect to what the government told them in closing, this is an objective term. The jury was told that again and again. And not only is it an objective term, but it was a term that was treated in the catalogs. Was it not supported by the instructions, or was the defendant free to show, no, it's not? I think when you look at the instructions, they all made it clear that it was an objective standard at a minimum. It was certainly ambiguous as to what was required. And that, I think, is the heart of the message here. Is that distribution as well as the importation? So, yes. The distribution suffers from the same problem as in RON. The importation, that's the fundamental problem that's both RON and REIT and the government's conceded that RON applies to importation, which is that when you look at it, the instructions that they were given really turned it into a strict liability statute. As long as you knew that you were importing something, you didn't have to know that you were doing it without knowing the instructions. They had to know it was a controlled substance. Right. They had to know it was a controlled substance. They had to know that they were importing it. But it did not require you to understand that you were doing so without authorization. And here we have an incredibly complicated regime with many regulations where they were licensed to buy things in the U.S. and where they were acting as if they knew there was no problem. Why wasn't it harmless, Sarah? Because the circumstantial evidence was overwhelming to prove mens rea on the set of distribution methods. I think I divided that into two answers, one for the distribution council and one for the importation council. So first for the importation council, there was nothing that showed the mens rea there, did they know it was unauthorized to import these, regardless of her pursuing these. And that is not clear at all. They were not correctly instructed, and we think the government can't show that that was harmless down to reasonable doubt. With respect to the distribution council, as my colleague pointed out, even if you take the evidence amounts to prove that it's something, that half the question is can it be attributed to the cowboys, that's the problem. Because Gettl was really the link between them and what may have happened at the pharmacy. The e-mail chain, I think, and again, I have notes everywhere, I will go back and check this. But I think the e-mail to say, come meet us at this bar, bring your tablet to Dr. Altamirano, or from the defendant to the physician. They were going to think there was no more beyond that. All of her evidence, I think, had to run from a gang council who competed for a lay identity to test victims whose names are found at the pharmacy, for whom she wrote prescriptions and testified to the jury. They never met them. They didn't know them. That's correct. I think that actually cuts in their favor. There's no connection between them. And I hear the Mr. and Mr. Bly saying, I'm sorry, I'll check, I'll check, but they all ended up knowing they're cowboys. And so I think the question is, can you tie even if you lose a bit of evidence, the medical evidence of distribution, to the formula group? I appreciate your intent as to the life and pharmacists they hired, but the cowboys, I think, are on those e-mail chains to the physician who was writing this extraordinary number of prescriptions of people who've never met him, right? There were 10 chains. Okay. And he was also treating some of their family members. So there is an evidence. Yes. They'll move their text of the communications from the defendant to that physician. They are. They're a handful. And I think without more context, they don't support the sort of extraordinary sprawling case here. They certainly don't cure the error in the instructions when it comes to distribution. Okay. Fair enough. Let me get this. Just one more question. I just have one more question. Isn't there a strong argument, though, that Rwanda does not apply to importation? It's a different worded statute. It has a different defense. I think Rwanda talks about some of these elements could be affirmative defenses. And so why wouldn't the idea that you have an objective authorization to import be an affirmative defense? And why does not that objective requirement take this out of Rwanda? Because there's also the subject of mandatory requirement. That's what Ron acknowledged. It's sort of a key element of any criminal offense. And so that was coming out for everything. It was very specific. For example, they talk about Rwandan rights. I talk about whether or not the decisions, whether or not it separates wrongful conduct from innocent conduct. And the fact that you have a license doesn't mean that you're wrongful or not. Right? If you import something, that could be wrong. To me, the fact that you have an authorization to import is a ministerial requirement. It has nothing to do whether or not you're blameworthy or not, or, you know, culpable in some way. So why would that mandatory apply to that? I mean, that makes it a candidature, right? I think it does make the detention. If you do not have the proper permits or proper licensing, then you are guilty of a crime, and it takes felony. If you do, then you are not. Well, and if he was going to eat it, the fact that he was going to eat a felon, that makes it actually a lawful status. Right. Or was it a lawful status? But that makes it wrongful. The fear of whether or not you have a license to import, why does that make it wrongful? I think fundamentally it goes to whether you have permission to bring it in to the United States when we're dealing with controlled substances which are highly regulated in America. You know, our patient counts are 5, 6, 7, and 8. One's a conspiracy charge, but 5, 6, 6, 7, and 8 are the importation count, and those pertain just to the steroids that came from China. Am I doing this correctly? Okay. So when Dr. Lee testified, a defense expert, that he purchased those three types of steroids from the pharmacy, that's pharmacy, he testified that he wasn't distributing those, that he was administering them directly in his office to those patients. Right? Correct. So my understanding is that's your evidence of the defendant having an incentive that the jury heard that that's an importation of substances, which is just those three. It's not anything compounded in the pharmacy, that it was not imported for a legitimate purpose. What this one office already had, what made it criminal in this case was the jury's determination. Well, the jury wasn't asked to determine that, but it was on the right property. It's whether it relates to you. Is there evidence that this pharmacy or the defendant imported anything other than those three steroids? I would have to go back and verify that. But in charge of the import, you mean it's not the three? No, it's just the steroids. No, it's just the steroids and the importation count. Okay.  Thank you. I think we're finally ready for the next couple of questions. All of you, thank you so very much. I know we really tortured you today, but this is an important case. We really appreciate all of your effort. We recognize how important this is to all of people's concerns, because our questions seemed unknowingly protracted. If you could take our threat really seriously and appreciate your understanding. Thank you. Thank you. Thank you.
judges: KLEINFELD, CHRISTEN, BUMATAY